# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1523-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

REGINALD ROACH, a/k/a
REGINALD W. HOLMES,

      Defendant-Appellant.

_____

Submitted April 8, 2019 – Decided May 7, 2019

Before Judges Sabatino and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 06-03-0342.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (David M. Liston, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a 2007 jury trial, defendant Reginald Roach was found guilty of aggravated sexual assault, burglary, and other offenses. His crimes arose out of the home invasion and sexual assault of a sixty-four-year-old woman, H.H.[1] He was sentenced to a forty-four-year aggregate prison term.

On direct appeal, we upheld defendant's conviction and sentence in an unpublished opinion, except for requiring the merger of one of his offenses. State v. Roach, No. A-1890-07 (App. Div. Aug. 1, 2011). The Supreme Court upheld his conviction as well, rejecting defendant's argument that the trial court violated his Confrontation Clause rights by admitting certain DNA evidence against him through the testimony of the State's expert witness. State v. Roach, 219 N.J. 58 (2014). The United States Supreme Court denied his petition for certiorari. State v. Roach, 135 S. Ct. 2348 (2015).

Defendant subsequently filed a timely petition in the Law Division for post-conviction relief ("PCR"), principally claiming his trial attorney was constitutionally ineffective in his advocacy with respect to the State's DNA proofs that identified him as the perpetrator in the home invasion and sexual assault. Among other things, defendant alleges his trial attorney was

---

[1] We use initials to protect the victim's privacy.

inadequately prepared, ineffective in cross-examining the State's testifying expert, and should have retained a competing DNA expert. The same judge who had presided over the trial rejected defendant's PCR petition, without finding an evidentiary hearing necessary.

In his present appeal, defendant makes the following points in his counseled brief:

> POINT I
>
> THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS, IN THAT TRIAL COUNSEL, BY HIS OWN ADMISSION, WAS UNPREPARED AND FAILED TO MOUNT A COMPLETE DEFENSE DUE TO LACK OF INVESTIGATION.
>
> POINT II
>
> THIS MATTER MUST BE REMANDED FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PREVIOUSLY UNADDRESSED CLAIMS. (NOT RAISED BELOW).

Defendant also advances three points in a pro se supplemental brief:

> PRO SE POINT I
>
> THE PCR COURT COMMITTED "HAR[M]FUL ERROR" WHEN IT TRIVIALIZED THE IMPORTANCE OF A DNA EXPERT FOR THE DEFENDANT, AND USED EVIDENCE OF A "NON

3

EXISTING" PRIOR CONVICTION TO JUSTIFY VIOLATING DEFENDANT'S VI AMENDMENT, AND TO "DIRECT EVIDENCE" OF THE USE OF CONTAMINATED DNA. (NOT RAISED BELOW)

PRO SE POINT II

PROSECUTORY [SIC] MISCONDUCT, AND ULTIMATE COLLUSION BY THE COURT, SUBSTANTIALLY PREJUDICED THE DEFENDANT AND MISLED THE JURY DURING THEIR FACT-FINDING DELIBERATION, VIOLATING HIS VI AND XIV AMENDMENTS UNDER THE CONSTITUTION, (NOT RAISED BELOW)

PRO SE POINT III

TRIAL COUNSEL WAS INEFFE[C]TIVE, ILL PREPARED, AND UNINFORMED: PRIOR TO TRIAL, DURING TRIAL AND DURING SENTENCING. HE NEGLECTED TO HAVE A DNA EXPERT, IN A DNA TRIAL, DIMINISHING THE STATE'S RESPONSIBILITY, VIOLATING VI AND XIV AMENDMENTS TO THE CONSTITUTION. (NOT RAISED BELOW)

For the reasons that follow, we affirm the PCR denial.

I.

The facts and procedural history were already canvassed in our prior opinion and the Supreme Court's opinion. We repeat portions relevant to the present appeal.

4                                                                              A-1523-17T4

The victim, H.H., testified at the jury trial that when she was sixty-four years old, she lived in a two-story townhouse in North Brunswick. H.H. testified that she awoke at approximately 1:30 a.m. on November 5, 2005, to find a man sitting on her bed, holding a pointed object to her neck and telling her to follow his orders so she will not "get hurt." The man then demanded money. When H.H. said she had some downstairs, they both went downstairs to get it while the man remained "very close" to her with the pointed object in his hand.

Once downstairs, H.H. opened a kitchen drawer for the man, but when she went to lift up the cutlery tray under which money was hidden, the man told her not to touch it. He lifted up the tray instead and took the money. Then the man ordered her back upstairs and told her to lie face-down on the bed. According to H.H., the man proceeded to sexually assault her. After the man fled the scene, H.H. called the police. Roach, 219 N.J. at 61.

North Brunswick Police Officer David Incle responded to the scene. The officer took H.H. to a hospital and then to a rape crisis center, where Registered Nurse Eileen Aiossa performed a forensic examination and prepared a sexual assault kit. During this examination, Aiossa took fingernail, oral, vaginal, and anal swabbings for DNA analysis. Aiossa also collected dry secretions from the inner aspect of H.H.'s left and right thighs. Finally, Aiossa collected head and

pubic hair combings, an external genital specimen, and the nightgown H.H. was wearing when she was sexually assaulted.

Aiossa also observed several injuries on H.H. Specifically, Aiossa saw a cut one-and-a-half centimeters long on the left side of H.H.'s neck and a cut a half-centimeter long on her neck's right side. Aiossa also observed two tears in H.H.'s vaginal opening, as well as fresh blood.

Aiossa individually sealed each of the collected specimens, and put the sealed specimens in a standardized sexual assault kit. She then gave this kit to Patrolman Incle.

After receiving the rape kit from Aiossa, Patrolman Incle brought both H.H. and the rape kit back to the North Brunswick Police Department. The rape kit specimens were delivered to the State Police Forensic Laboratory ("the State Lab").

H.H. was interviewed by Lead Investigator Paul Miller from the Middlesex County Prosecutor's Office. H.H. described her attacker to the police as "slim, soft-spoken, and taller than she." Id. at 62. She was unable to identify him because she had not seen his face.

After investigating H.H.'s residence and the surrounding area, the police spoke to neighbors who initially identified a male "E.A." as a potential suspect.

A buccal swab was obtained from E.A. and sent to the State Police Lab for analysis. Ibid.

Defendant was thereafter developed as a suspect, based initially on a tip from a confidential informant. Upon learning that defendant lived less than a mile away from H.H., investigators went to his residence to talk to him. Defendant was not home when the investigators arrived, and Investigator Miller left his business card. Several days later, Miller received a phone message from defendant denying any knowledge about the crime. Defendant refused Miller's request to voluntarily submit a buccal swab sample.

Miller testified that, after defendant refused to provide a sample, he realized that a previous DNA sample from defendant was already in the Combined DNA Index System ("CODIS") because defendant was a convicted felon. Miller accordingly asked the State Lab to compare the DNA sample taken from H.H. to defendant's prior sample in CODIS. The State Lab informed Miller that defendant's previous DNA sample matched the sample taken from H.H., and defendant was subsequently arrested. Pursuant to a court order, investigators obtained defendant's fingerprints and a new buccal swab sample, which was used to again confirm the CODIS match, and as evidence in the trial.

7

Charles Williams, a forensic scientist in the Biochemistry Department of the State Lab, tested the items in the sexual assault kit for the presence of blood and sperm. Id. at 62. According to Williams, "the vaginal slide tested positive for sperm, the external genital specimen and anal swab tested positive for blood, and the dried secretions from H.H.'s thighs tested positive for both blood and sperm." Ibid. Those specimens were passed along to the DNA Department of the State Lab along with H.H.'s buccal swab. Ibid.

Thereafter, Lydia[2] Schiffner, a forensic scientist with the DNA Department of the State Lab, received the items from H.H.'s sexual assault kit, as well as the buccal swabs taken from H.H. and E.A. Id. at 64. Specifically, Schiffner analyzed H.H.'s buccal swabs, vaginal swabs, anal swabs, and swabbings from the left and right-thigh areas and generated DNA profiles from those swabs. Schiffner performed a differential extraction on each specimen to separate the sperm cells from the skin cells, creating separate sperm-cell fractions ("SCF") and non-sperm-cell fraction ("NSCF") samples from each specimen. Ibid.

Based on the analysis that Schiffner performed, she was able to create a full DNA profile for the individual who had contributed the sperm cells to the

---

[2] The Supreme Court opinion spells the expert's first name "Linnea."

specimens taken from H.H., as well as DNA profiles for H.H. and E.A. from their respective buccal swabs. Id. at 64. Schiffner's report concluded that E.A. was excluded as a possible contributor to the DNA profiles from the sperm cell fractions of the inner thigh samples. Ibid.

After Schiffner generated her report in December 2005, she relocated to a distance state and the H.H. file was assigned to Jennifer Banaag, another forensic scientist in the DNA Department of the State Lab. Ibid. Banaag eventually testified for the State at trial as an expert in DNA analysis.

Banaag reviewed Schiffner's entire case file and, as she put it, "independently" agreed with Schiffner's analysis. Banaag testified that Schiffner analyzed the swabs from H.H. and came up with a DNA profile of a suspect who was the secondary contributor (H.H. being the primary contributor) to the DNA recovered from H.H.'s thigh swabs. In the meantime, Banaag analyzed the DNA taken from defendant's buccal swab and generated a full DNA profile for him. Ibid. Banaag testified that her DNA analysis revealed that defendant's DNA matched that of the secondary contributor to the secretion found on the two thigh swabs from H.H. in thirteen locations of alleles.

Banaag testified that the DNA profile found in defendant's samples was estimated to occur in only one in approximately 1.3 quintillion African

Americans, one in 339 quintillion Caucasians, and one in 7.42 quintillion Hispanics. Ultimately, Banaag concluded, "within a reasonable degree of scientific certainty," that defendant was the source of the DNA taken from H.H.'s thigh swabs. Ibid.

On cross-examination of Banaag, defendant's trial counsel focused extensively on potential flaws in the procedures used by the State Lab to ensure accurate testing and results. Defense counsel asked Banaag detailed questions about the process of detecting, separating, and amplifying the DNA samples. After asking Banaag to explain that process, defense counsel followed up with a question asking Banaag to explain if the "reagents" she just mentioned were called "primers," a term that Banaag did not use previously in her testimony on direct. Banaag confirmed that the substances are called primers, and at defense counsel's request, she explained what a primer is. Defense counsel then followed up with a question about whether the State Lab uses "buffers" – another term not previously mentioned by Banaag – and Banaag confirmed that they used such buffers and explained what they are.

Defense counsel then proceeded to probe Banaag with questions about where the State Lab purchases their testing kits from; the intricacies of the machine used to generate and mix the samples, including questions about the

accuracy of those machines and how the computer generates the results from the machine; the accuracy of her statistical calculations; and the quality controls and procedure used by the scientists in the Lab. Counsel also highlighted the fact that Banaag discussed only the alleles generated from H.H.'s thigh samples, but did not mention the results of the other samples contained in the rape kit.

Before summations, the trial judge complimented defense counsel outside of the jury's presence on his cross-examination of Banaag:

> THE COURT: You did a good job on cross. For someone who claims doesn't know much about DNA you did a good job. Let the record reflect that you did.
>
> PROSECUTOR: He could have fooled me.
>
> DEFENSE COUNSEL: I'm a quick learner.

During summations, defense counsel spoke at length about the DNA evidence and pointedly called Banaag's testimony into question. Counsel suggested to the jury that the DNA samples could have mislabeled, the testing machines could have been inaccurate, and that the scientists could have accidently contaminated the specimens by not following protocol. As such, the summation reinforced the attack defense counsel presented earlier in his cross-examination of Banaag.

Despite this advocacy by defense counsel, the jury returned a verdict in the State's favor. On direct appeal, we rejected defendant's argument that his confrontation rights were violated by the forensic evidence introduced through Banaag's testimony. State v. Roach, No. A-1890-07 (App. Div. Aug. 1, 2011). The Supreme Court upheld that conclusion. Roach, 219 N.J. at 82.

A crucial facet of the Supreme Court's decision was the fact that Banaag had independently reviewed and verified Schiffner's results and did not "merely parrot" Schiffner's findings. Id. at 79. The Court emphasized, however, that such "testimony must be provided by a truly independent and qualified reviewer." Ibid. Concluding that Banaag's testimony appropriately "explained how she used her scientific expertise and knowledge to independently review and analyze the graphic raw data . . . generated [from] Schiffner's testing," id. at 81, the Court ruled that the defense "had the opportunity to confront Banaag on her conclusions and on the facts that she independently reviewed, verified, and relied on in reaching those conclusions." Id. at 82-83.

Having thus failed to demonstrate on direct appeal that the trial court erred in admitting the State's DNA expert's testimony, defendant turned his sights on his former counsel in a PCR petition. In particular, he complained his attorney was unprepared to deal with the DNA proofs at trial and should have retained a

12

competing DNA expert. He also alleged ineffective assistance on other aspects of the case. We turn to those claims of ineffectiveness.

## II.

Under the Sixth Amendment of the United States Constitution, a person accused of crimes is guaranteed the effective assistance of legal counsel in his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish a deprivation of that right, a convicted defendant must satisfy the two-part test enunciated in Strickland by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Ibid.; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey).

When reviewing such claims of ineffectiveness, courts apply a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy . . . ." Fritz, 105 N.J. at 54 (citation omitted); see also State v. Echols, 199 N.J. 344, 357-59 (2009).

"The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006) (citing State v. Marshall 123 N.J. 1, 165 (1991)). "As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial.'" Id. at 314-15 (alteration in original) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)). Moreover, "'an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial.'" State v. Allegro, 193 N.J. 352, 367 (2008) (quoting Castagna, 187 N.J. at 314).

The applicable law further instructs that, in order to obtain an evidentiary hearing on a PCR petition based upon claims of ineffective of assistance of counsel, a defendant must make a prima facie showing of both deficient performance and actual prejudice. State v. Preciose, 129 N.J. 451, 463 (1992). "To establish such a prima facie case, the defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed on the merits." Marshall, 148 N.J. at 158; see also R. 3:22-10(b).

"When determining the propriety of conducting an evidentiary hearing, the PCR court should view the facts in the light most favorable to the defendant." State v. Jones, 219 N.J. 298, 311 (2014) (citing Marshall, 148 N.J. at 158). See also Preciose, 129 N.J. at 462-63. "However, a defendant is not entitled to an evidentiary hearing if the 'allegations are too vague, conclusory, or speculative to warrant an evidentiary hearing.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting Marshall, 148 N.J. at 158).

When, as here, a defendant claims his trial attorney "inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (citing R. 1:6-6). "Bald assertions" of deficient performance are insufficient to support a PCR application. Ibid. See also R. 3:22-10(b); Porter, 216 N.J. at 356-57 (reaffirming these principles in evaluating which of a defendant's various PCR claims warranted an evidentiary hearing).

Having applied these well-established standards to defendant's present appeal, we affirm the trial court's denial of his PCR petition. We do so substantially for the sound reasons set forth by Judge Dennis V. Nieves in his

comprehensive written opinion dated August 31, 2017. We amplify the judge's analysis with a few additional comments.

We agree with Judge Nieves that defendant has not made a prima facie showing on the first prong of Strickland, i.e., deficient performance by trial counsel relating to the DNA evidence. From our own review of the trial transcripts, we share the judge's assessment that defense counsel capably attempted to undermine the State's DNA proofs linking him to the semen and genetic material found on the victim. The fact that the jury ultimately was persuaded by the State's evidence and found defendant guilty does not mean that defense counsel's efforts fell below the standards of professional competency.

Defendant stresses that his trial counsel asserted to the court at a pretrial hearing on January 3, 2007 that he was "unprepared" to proceed to trial and would need about "a year or two" to educate himself sufficiently enough to counter the State's DNA evidence. These comments by defense counsel seeking a long postponement of the looming trial appear, in context, to be hyperbole. When the trial convened a week later, defense counsel nonetheless exhibited substantial knowledge of the subject matter. He strenuously advocated his client's interests in attempting to impeach the State's DNA expert. Moreover, as

16

we have already noted, the trial judge complimented counsel after his cross-examination, a compliment that appears from the transcript to be well-deserved.

Defense counsel also competently preserved, through a timely objection, defendant's constitutional argument of a denial of confrontation rights stemming from Schiffner's absence at trial. This was an important legal issue with widespread implications that was not resolved until the Supreme Court's 2014 opinion in this case and in the two companion opinions the Court issued that same day. See, e.g., State v. Michaels, 219 N.J. 1 (2014); State v. Williams, 219 N.J. 89 (2014). Although defendant's constitutional argument was ultimately not adopted by the Supreme Court majority, that is no indication of any failure of competent advocacy.

The PCR court reasonably rejected defendant's claim that his trial attorney was professionally deficient because he did not present testimony from an opposing DNA expert. As Judge Nieves observed in his PCR opinion, defense counsel attempted to retain one or more DNA experts but "they were not much help" because they required additional documents. Defense counsel then sought to obtain those documents by moving to compel discovery. On the whole, the judge found "[i]t is clear that trial counsel investigated the issues related to DNA

evidence and that defense counsel attempted to hire a DNA expert well before the onset of trial."

Furthermore, defendant has failed to supply a report or certificate from a DNA expert attesting to opinions that could support a prima facie claim of a Sixth Amendment violation. The mere "bald assertions" of defendant himself that further investigation and advocacy concerning the DNA proofs are inadequate to warrant relief or justify an evidentiary hearing. Porter, 216 N.J. at 349.

Given the statistical force of the DNA match in this case, it may well be that no opposing expert or a more experienced lawyer could have done more to undermine those proofs effectively. In sum, both prongs of Strickland, i.e., deficient attorney performance and actual prejudice stemming from alleged subpar advocacy, are simply not present here.

The remaining arguments posed by defendant in his appellate brief and pro se supplemental brief lack sufficient merit to warrant discussion in this written opinion, beyond the cogent analysis already set forth in Judge Nieves' written opinion. R. 2:11-3(e)(2).

As one minor aside, we find no merit in defendant's pro se assertion that the PCR judge critically overlooked Point "F" of his pro se PCR supplemental

brief challenging the accuracy of a November 17, 2006 pretrial transcript concerning a confidential informant.  Defendant provides no evidence to substantiate that the transcript is incorrect.  He does not disprove the transcriber's presumptively valid certification of accuracy.  See Rule 2:5-5(a); see also State v. Kuske, 109 N.J. Super. 575, 592-93 (App. Div. 1970) (finding, on a motion to settle the record, the court reporter's affidavit that the trial transcript was "true and correct" more credible than defendant's pro se accusation of transcription errors).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1523-17T4