SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Jose Carrion (A-14-20) (084390)**

**Argued October 13, 2021 -- Decided December 27, 2021**

**LaVECCHIA, J., writing for a unanimous Court.**

This appeal, and the companion case of State v. Hedgespeth, ___ N.J. ___ (2021), have in common an issue concerning the right to confrontation in the context of the admission of an affidavit attesting that a search of a State firearm registry revealed no lawful permit for an individual's possession of a handgun. Defendant Jose Carrion also raises a suppression issue. He appeals the denial of his motion to suppress a statement that he made to law enforcement and for which he received Miranda warnings, but that he made after an earlier, unwarned statement.

In June 2012, Newark law enforcement secured a warrant for Carrion's arrest, based on allegations that Carrion shot a victim in the ankle. Five officers executed the warrant. Carrion's wife let them into the home, where they placed handcuffs on Carrion who was sleeping on the couch; her fourteen-year-old son, Abel, witnessed the arrest.

According to the State's witnesses, while carrying out the arrest, the officers observed a "black pouch" with narcotics protruding out of it sitting on a table. On spotting the pouch, a detective examined it, saw drugs and a gun inside it, and alerted his fellow officers to the presence of a weapon. The officer testified that Carrion admitted to owning the bag without being asked any questions. Carrion's wife and her son, however, testified that the officers asked Carrion whether he had anything in the house and told Carrion that if he did not admit ownership of the bag, DYFS would be contacted about taking the children from the home. After his arrest, Carrion was transported to the station.

About six hours later, a detective who was not involved in the arrest took a statement from Carrion after informing him of Miranda rights. Carrion stated that he understood those rights and read and signed a waiver form. During his interrogation, Carrion alleged that someone else shot the victim but admitted that the gun was his.

Carrion was indicted on weapons and drug offenses, as well as assault. He moved to suppress both statements made to the police. He argued that his first statement made while at his apartment -- admitting ownership of the black pouch containing the gun and drugs -- should be suppressed because it constituted an interrogation and the officers

1

failed to give him <u>Miranda</u> warnings prior to their questioning. As for his later recorded statement at the police station, he argued that too should be suppressed as an unlawful extension of the prior failure to provide <u>Miranda</u> warnings. The court granted Carrion's motion to suppress the first statement but denied his motion to suppress the second.

At trial, the prosecution sought to admit an affidavit of Brett C. Bloom of the State Firearms Investigative Unit, asserting that Bloom searched and found no record that Carrion had a firearm permit. The State asked the court to submit the affidavit as a self-authenticating document under N.J.R.E. 902(k) and under the absence-of-a-public-record exception to the hearsay rule, N.J.R.E. 803(c)(10). Defense counsel objected, arguing that there were hearsay and Confrontation Clause issues. The court found the document both reliable and admissible under N.J.R.E. 902(k) and exceptions to the hearsay rule.

Carrion was convicted and sentenced. The Appellate Division affirmed, and the Court granted certification. 244 N.J. 280 (2020); 244 N.J. 503 (2020).

**HELD:** The State's reliance on an affidavit by a non-testifying witness to introduce over defendant's objection the results of the database search violated defendant's right to confront the witnesses against him. And, under the totality of the circumstances, Carrion's second statement should have been suppressed because the <u>Miranda</u> warnings issued to Carrion prior to his second statement to police were insufficient in these circumstances to ensure that his waiver of rights was voluntary and knowing. Because of its holding on the suppression issue, the Court cannot conclude that the denial of defendant's right to confrontation constituted harmless error. For the purposes of future matters, to ensure protection of defendants' confrontation rights and the orderly production of essential witnesses in judicial proceedings, the Court addresses a method to avoid confrontation violations in these settings.

1. The Federal and State Constitutions provide that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. In <u>Crawford v. Washington</u>, the United States Supreme Court announced a three-part test for assessing a violation of the Confrontation Clause. The test asks (1) whether the statement was testimonial, (2) whether the witness was unavailable to testify, (3) and whether there was a prior opportunity for cross-examination. 541 U.S. 36, 68 (2004). It is the first prong of that test -- whether Bloom's affidavit attesting to no record of Carrion possessing a gun permit was testimonial -- that is at issue. <u>Crawford</u> identified "formulations of [the] core class of testimonial statements," including "material such as affidavits . . . that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially" or "at a later trial." <u>Id.</u> at 51-52. In <u>Melendez-Diaz v. Massachusetts</u>, the Supreme Court held that affidavits reporting the results of forensic analysis are "testimonial," rendering the affiants "witnesses" subject to the defendant's Sixth Amendment right to confrontation. 557 U.S. 305, 307, 310 (2009). (pp. 14-17)

2

2.  The Court notes that although there is some ambiguity about who must testify about out-of-court data analysis, there is no ambiguity here because no one testified regarding the affidavit.  The firearm license database -- raw data, collected for a neutral administrative purpose -- is a non-testimonial "document" for Confrontation Clause purposes.  But the creation of a document attesting to an interpretation or search of that data -- for the sole purpose of prosecuting a defendant -- is testimonial.  With only the affidavit, and with no opportunity to question the officer knowledgeable about how the search of the database was performed, Carrion could not explore whether the officer used the correct date of birth, name, or other identifying information to generate a correct search of the database, and what information that search produced.  Because the affidavit attesting to Bloom's search of the database is testimonial, and in light of the fact that Bloom did not testify and was not previously subjected to cross-examination, Carrion's right to confrontation was violated.  (pp. 17-20)

3.  The confrontation error here was not harmless because the absence of a permit is an essential element of the weapons-possession offense with which Carrion was charged:  to obtain a conviction, the State would have to prove that the gun belonged to him and that he did not possess the appropriate permit.  The constitutional confrontation right entitled defendant, who raised a timely objection, to claim error in his trial.  (pp. 20-22)

4.  Going forward, to help alleviate the administrative concerns of the State, the Court adopts the practice of notice and demand for the presentation of a State witness to testify to the search of the firearm permit database.  That process will protect a defendant's right to confrontation.  By not demanding the witness's testimony, the defendant waives his confrontation right.  In many cases, the defendant may conclude the production of the witness is unnecessary.  At the same time, a notice requirement will promote administrative and judicial efficiency.  The Court has adopted such useful practices before and has seen their benefits in other settings that include Crawford considerations.  E.g., State v. Wilson, 227 N.J. 534, 553-54 (2017) (creating a notice and demand procedure for certified survey maps).  The Court refers the matter to the Criminal Practice Committee to study the issue generally and propose a court rule.  (pp. 22-23)

5.  Turning to defendant's suppression motion, the Court notes that one of the most fundamental rights protected by both the Federal Constitution and state law is the right against self-incrimination.  In Miranda v. Arizona, the Supreme Court put safeguards in place to protect the privilege against self-incrimination and respond to the "inherently compelling pressures which work to undermine the individual's will to resist and to compel [an individual subject to custodial interrogation] to speak where he would not otherwise do so freely."  384 U.S. 436, 467 (1966).  Although defendants may waive "effectuation of" their Miranda rights, the waiver must be one that "is made voluntarily, knowingly, and intelligently."  Id. at 444.  Here, the Court must decide whether a confession, given after Miranda warnings, can be admissible when the suspect has previously been subjected to unwarned questioning in which he confessed.  (pp. 23-25)

3

6.  A natural concern in those circumstances is that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed." United States v. Bayer, 331 U.S. 532, 540-41 (1947).  In State v. O'Neill, the Court fashioned a test for determining the admissibility of such statements:  to assess how effectively the warnings in the second interrogation functioned, courts should consider all relevant factors, including (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.  193 N.J. 148, 180-81 (2007).  The O'Neill decision pointed out that factor four, when found to be present, should receive "great weight" because "[p]roviding that information would strongly suggest that the defendant made any post-warning incriminating statements knowingly, voluntarily, and intelligently."  Id. at 181.  But the O'Neill Court took pains to stress that no single factor is determinative.  See id. at 181-82.  (pp. 25-27)

7.  Underscoring the Court's emphasis in O'Neill that it was not creating a bright line, the Court rejects competing arguments by amici in this case that would render factor four conclusive.  Applying all of the O'Neill factors in light of the totality of the circumstances, and relying on the trial court's factual findings, the Court determines that the first factor favors suppression because Carrion faced two sources of psychological pressure not to assert his Miranda rights in his second interview:  the fact that he had already let the cat out of the bag in his first statement, and the potential belief that the threat to call DYFS, unless he admitted ownership of the black bag, was still in effect.  The Court notes that the first, second, and fifth factors all favor admission of the second statement, but that the fourth factor, like factor one, favors suppression.  The Court explains in detail why, when considered qualitatively, factors one and four, in this particular case, outweigh the other factors.  (pp. 28-37)

8.  The Court concludes by noting that it is rare that an unconstitutionally secured confession is deemed harmless beyond a reasonable doubt.  Admission of Carrion's second statement was not harmless in this case.  (p. 38)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.**

4

State of New Jersey,

Plaintiff-Respondent,

v.

Jose Carrion, a/k/a
Jose Carrison,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| October 13, 2021 | December 27, 2021 |

John P. Flynn, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John P. Flynn, of counsel and on the briefs, and Gilbert G. Miller, Designated Counsel, on the briefs).

Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Barbara A. Rosenkrans, of counsel and on the briefs).

William J. Munoz argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey

(Whipple Azzarello, attorneys; William J. Munoz, on the brief).

Amanda G. Schwartz, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Andrew J. Bruck, Acting Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

This appeal, and the companion case of State v. Hedgespeth, ___ N.J. ___ (2021), have in common an issue concerning the right to confrontation in the context of the admission of an affidavit attesting that a search of a State firearm registry revealed no lawful permit for an individual's possession of a handgun. See N.J.S.A. 2C:39-5(b) (making it an offense to possess a handgun without a permit as provided in N.J.S.A. 2C:58-4).

In this matter, defendant Jose Carrion contends the trial court erred in admitting information contained in an affidavit from a non-testifying detective of the Firearms Investigation Unit of the Department of Law and Public Safety (DLPS). The admitted evidence showed that the non-testifying detective's search of the database revealed no permit existed authorizing Carrion to lawfully possess a handgun when one was seized by police from his home. Applying the test from decisions interpreting the federal Confrontation Clause, which we have adopted in our state confrontation jurisprudence, we conclude

that, while the raw data contained in the database listing issued firearm permits is not "testimonial" for purposes of a confrontation-right analysis, statements about the search of that database for information specific to defendant for use in his prosecution is testimonial. Here, the State's reliance on an affidavit by a non-testifying witness to introduce over defendant's objection the results of that search violated defendant's right to confront the witnesses against him.

Carrion also raises a suppression issue. He appeals the denial of his motion to suppress a statement that he made to law enforcement and for which he received Miranda[1] warnings, but that he made after an earlier, unwarned statement. Specifically, defendant contends that State v. O'Neill, 193 N.J. 148 (2007), and its instructions for analyzing the voluntariness of his waiver of rights was misapplied in the two-step, unwarned-then-warned interrogation setting that led to his incriminating second statement. Under the totality of the circumstances, we conclude that his second statement -- in which he accepted responsibility for, among other things, the weapon found in his home -- also should have been suppressed. The Miranda warnings issued to Carrion prior to his second statement to police were insufficient in these circumstances to ensure that his waiver of rights was voluntary and knowing.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

Because of our holding on the suppression issue, we cannot conclude that the denial of defendant's right to confrontation constituted harmless error. For the purposes of future matters, to ensure protection of defendants' confrontation rights and the orderly production of essential witnesses in judicial proceedings, we address a method to avoid confrontation violations in these settings.

## I.

On June 25, 2012, Newark law enforcement officers secured a warrant for Carrion's arrest. The warrant was based on allegations that on June 19, Carrion shot Juan Rivera in the ankle over a $420 debt. For purposes of this appeal, we focus on the events associated with the execution of Carrion's arrest, his statements to police, and the confrontation issue that arose at trial.

## A.

### 1. The Arrest

Pursuant to testimony presented by the State at the suppression hearing, five officers from the Newark Police Department executed the arrest warrant for Carrion on June 28, 2012. The officers knocked on Carrion's apartment door, and his wife, Biomaryluz Gonzalez, answered. She told the officers that Carrion was inside. The officers entered the home and placed handcuffs on

Carrion who was sleeping on the couch. Gonzalez's fourteen-year-old son, Abel Trevino, who is not Carrion's biological son, witnessed the arrest.

According to the State's witnesses, while carrying out the arrest, the officers observed a "black pouch" with narcotics protruding out of it sitting on a table. On spotting the pouch, Detective Maldonado examined it, saw drugs and a gun inside it, and alerted his fellow officers to the presence of a weapon. According to Maldonado's testimony, once the officers found the pouch, Carrion began "shaking" and "owned up to it, he said it was his and he wanted to kiss his son, because, you know, he didn't want to get handcuffed in the presence of his child." Maldonado testified that he did not ask Carrion any questions after Carrion admitted to owning the pouch, nor did he make any promises or threats to Carrion in exchange for Carrion admitting that the pouch was his.

Gonzalez and her son, Abel, also testified at the suppression hearing. Gonzalez explained that at the time of the arrest she was living with Carrion and her three children, the youngest of whom (two years old at the time of the arrest) is Carrion's biological son. She testified that upon handcuffing Carrion, the officers asked Carrion "if he had something in the house." And, as she put it, the officers told Carrion that "he had to tell [the officer] because, if not, if

5

he didn't say, they were going to call DY[FS][2] and take my children, and also, they were going to get me involved in this case." Gonzalez testified that the officers were moving items in the house as they were looking around, and eventually, Carrion "told them that there was something behind the green couch." According to Gonzalez, the "black purse," as she described it, was not found until the officers moved the couch.

Abel testified that he was sleeping upstairs when the officers entered the home. Upon hearing them, he came downstairs to the first floor and saw the officers looking around, which ultimately resulted in them finding "a bag." According to Abel, upon finding the bag, the officers began "trying to force my mom, my father, both of them, saying to admit" that the bag was Carrion's, otherwise the officers would take Abel and his siblings "to DYFS."

2. The Subsequent Interrogation and Charges

The details concerning Carrion's police station interrogation are derived from the suppression hearing as well as from defendant's trial, at which the full interview was admitted into evidence.

---

[2] As of June 29, 2012, the Division of Youth and Family Services (DYFS) was renamed the Division of Child Protection and Permanency (DCPP). L. 2012, c. 16, § 20 (codified at N.J.S.A. 9:3A-10(b)). Because at the time of Carrion's arrest, DCPP was still DYFS (albeit for only one more day), and the witnesses referred to the agency as such, we will do the same.

About six hours after Carrion was arrested at his home and transported to the police station, Detective Lydell James, who was not involved in the arrest, took a statement from him at 11:50 a.m. James began the interview by reading Carrion his Miranda rights. Carrion stated that he understood those rights; he then read a Miranda form, acknowledged that he understood the waiver provision of the form, initialed the waiver, and signed the form. Carrion also acknowledged that he has a high school diploma and two years of college, and that he can read, write, and speak English.

During his interrogation, Carrion alleged that someone else shot Rivera; however, he admitted that the gun found in his apartment was his, stating that he bought it from a friend and had not obtained a license for it.

Thereafter, an Essex County Grand Jury indicted Carrion for second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree attempted aggravated assault, N.J.S.A. 2C:12-1(b)(2); second-degree possession of a firearm while committing a CDS offense, N.J.S.A. 2C:39-4.1(a); fourth-degree unlawful possession of a firearm without a permit, N.J.S.A 2C:39-10(a);[3] three counts of third-degree possession of CDS (heroin,

---

[3] The indictment charged defendant in count five with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), but the count was later amended to the fourth-degree offense.

oxycodone, and 1-phenyl 2-1 pentanone), N.J.S.A. 2C:35-10(a)(1); three counts of third-degree possession of CDS with the intent to distribute, N.J.S.A. 2C:35-5(a)(1); and three counts of third-degree possession of CDS within 1,000 feet of a school, N.J.S.A. 2C:35-7.

B.

Prior to trial, defendant filed a motion to suppress both statements he made to the police. He argued that his first statement made while at his apartment -- admitting ownership of the black pouch containing the gun and drugs -- should be suppressed because it constituted an interrogation and the officers failed to give him <u>Miranda</u> warnings prior to their questioning. As for his later recorded statement at the police station, he argued that too should be suppressed as an unlawful extension of the prior failure to provide <u>Miranda</u> warnings.

After hearing testimony from Detectives James and Maldonado, as well as Gonzalez and Abel, the trial court found the detectives' testimony to be credible, Gonzalez's testimony to be "partially credible," and Abel's testimony to be "minimally credible."

The court first determined that Carrion's initial statement to police while in the apartment should be suppressed. The court found that the statement was the product of a custodial interrogation and that the officers should have

8

administered <u>Miranda</u> warnings.  In making that determination, the court stated it was giving defendant "the benefit of the doubt" that the officers' reference to DYFS becoming involved -- to which both Gonzalez and Abel testified -- was a motivating consideration.  The court's suppression of Carrion's statement at the apartment is not on appeal here.

As to Carrion's second statement -- the statement taken by Detective James at the police station in which Carrion admitted ownership of the gun and that the gun was unlicensed -- the court noted that there was no question that defendant received his <u>Miranda</u> warnings prior to that custodial interrogation. The court therefore framed the issue as whether defendant knowingly and intelligently waived his rights.  Considering the totality of the circumstances, the trial court found Carrion's waiver to be voluntary.  The court identified the factors it found persuasive in reaching its decision.

> Factors, again, that I have considered, the defendant's -- the time of the interrogation, defendant's education.  I will note that the -- the interview was short.  It lasted approximately 12 minutes.  Mr. Carrion's age has been considered.  He's 36 years old at the time of the statement.  His education has been considered.  He has a high school diploma.  He also has two years of college, and he said he can read and write English.  He told Detective James that he understood him and he understood the <u>Miranda</u> waiver form.
>
> Furthermore, it is appropriate for the Court to consider a defendant's previous encounters with law enforcement in determining the voluntariness of the

9

defendant's waiving the <u>Miranda</u>. . . . As such, I will note that Mr. Carrion has had previous encounters with law enforcement. He has one prior conviction.

The court further noted that defendant told James he was not threatened, coerced, made any promises, or pressured to give the statement and that Carrion sounded very comfortable and calm throughout the statement. In addition, the court noted that the statement was provided at 11:55 a.m., several hours after the arrest, and thus was a "separate event" from the original statement in the apartment.

From the totality of those circumstances, the court concluded that the State had met its burden of proving, beyond a reasonable doubt, that defendant's waiver of rights before his second statement was knowing and voluntary. Accordingly, the court denied defendant's motion to suppress his second statement.

C.

At trial, during the presentation of the State's case, the prosecution sought to admit an affidavit of Brett C. Bloom of the DLPS Firearms Investigative Unit, asserting that Bloom searched and found no record that Carrion had a firearm permit. The State asked the court to submit the affidavit as a self-authenticating document under N.J.R.E. 902(k) and under the absence-of-a-public-record exception to the hearsay rule, N.J.R.E. 803(c)(10).

10

Defense counsel objected, arguing that there were hearsay and Confrontation Clause issues.  The defense emphasized that the document was created for the primary purpose of being used in a prosecution and that it required authentication by a live witness.  Turning aside the objections, the court found the document both reliable and admissible under N.J.R.E. 902(k) and exceptions to the hearsay rule.  Portions of the document were allowed to be read into the record; however, it appears that the document itself was not entered into the record.[4]

On February 8, 2017, the jury found defendant guilty on all counts except for third-degree attempted aggravated assault, for which defendant was convicted of the lesser-included offense of fourth-degree aggravated assault, and two of the drug possession charges, for which he was acquitted.  The court sentenced defendant to an aggregate term of eighteen years in prison with ten years of parole ineligibility.

### D.

Defendant appealed, contending that the trial court (1) erred in denying his motion to suppress the second statement taken at the police station and (2) violated his confrontation rights in admitting the affidavit of a non-testifying

---

[4]  The State acknowledged at oral argument that the document was not entered into the record.  Therefore, we refer only to the transcript at trial where portions were read aloud.

detective who affirmed that no record of a permit for defendant's handgun existed.

In an unpublished opinion, the Appellate Division affirmed. Applying this Court's test for assessing a "two-step interrogation case," announced in O'Neill, 193 N.J. at 180-81, the Appellate Division held that Carrion's post-warning statement was admissible. The Appellate Division noted that the post-warning questioning took place six hours after the first unwarned questioning and an officer unconnected with the arrest conducted the subsequent interview in which Carrion received Miranda warnings and waived them. In the Appellate Division's view, James's failure to inform Carrion that his pre-warning statement could not be used against him did not outweigh the other O'Neill factors.

Second, the Appellate Division affirmed the trial court's evidentiary ruling that the no-permit affidavit was self-authenticating under N.J.R.E. 902(k) and admissible under the absence-of-a-public-record hearsay exception, N.J.R.E. 803(c)(10). The court further held that "[e]ven if the affidavit was admitted in error, such an error was harmless as defendant admitted he received the gun from a friend and never registered the weapon." The appellate court did not address defendant's confrontation right argument.

12

We granted defendant's petition for certification, initially limited to the Miranda-based suppression issue. 244 N.J. 280 (2020). Thereafter, on a motion for reconsideration, we granted certification on defendant's claimed confrontation violation. 244 N.J. 503 (2020). We also granted amicus status to the Association of Criminal Defense Lawyers (ACDL) and to the Attorney General.

## II.

## A.

We begin by addressing whether defendant's confrontation rights were violated by the State's admission of an affidavit of a non-testifying witness attesting to having conducted a search of the State's firearm registry database -- a search that produced no evidence of a handgun permit issued to defendant.

According to defendant, this document is testimonial because it was produced in anticipation of the prosecution against him. He argues that an application of the principles set forth in Melendez-Diaz v. Massachusetts supports his right to confront the preparer of the testimonial document where the prosecution seeks to admit a "clerk's certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it." 557 U.S. 305, 323 (2009). Defendant's position is supported by the ACDL.

13

The State, on the other hand, distinguishes Melendez-Diaz, and urges this Court to find persuasive out-of-state authority that held that similar affidavits were non-testimonial for confrontation purposes. The State also asserts that if its position is in error, the error here is harmless because Carrion admitted to possessing the gun without a permit in his second statement to police. The Attorney General supports the State's arguments on this issue.

B.

In essentially identical language, the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution "provide that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" State v. Wilson, 227 N.J. 534, 544 (2017) (quoting U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). The Confrontation Clause applies to "witnesses against the accused," or those who "bear testimony," which is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford v. Washington, 541 U.S. 36, 51 (2004) (quotations omitted). In Crawford, the United States Supreme Court announced a three-part test for assessing a violation of the Confrontation Clause.[5]

---

[5] This Court has had multiple occasions to examine Crawford and the series of Supreme Court decisions that followed. Crawford and its progeny altered the earlier jurisprudence that had been based on Ohio v. Roberts, 448 U.S. 56, 66

14

The Crawford test asks "whether the statement was testimonial, whether the witness was unavailable to testify, and whether there was a prior opportunity for cross-examination." State v. Michaels, 219 N.J. 1, 17 (2014) (citing Crawford, 541 U.S. at 68). It is the first prong of that test -- whether Bloom's affidavit attesting to no record of Carrion possessing a gun permit was testimonial -- that is at issue.

Although Crawford did not define "testimonial statements," it identified "formulations of [the] core class of testimonial statements," such as

> ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

---

(1980), which previously tied the constitutional confrontation right to an examination of a statement's reliability. Our earlier cases applying Crawford, beginning with State v. Michaels, 219 N.J. 1 (2014), and State v. Roach, 219 N.J. 58 (2014), explored who must testify when confrontation is demanded concerning results in out-of-court analyses, such as certain laboratory testing, and later in other settings. E.g., State v. Bass, 224 N.J. 285 (2016) (autopsies); Wilson, 227 N.J. 534 (survey maps); see also State v. Williams, 219 N.J. 89, 99 (2014) (explaining that a defendant must demand confrontation or the right will be waived by silence).

15

[Crawford, 541 U.S. at 51-52 (emphasis added) (citations and quotations omitted).]

In Melendez-Diaz, the Supreme Court addressed whether affidavits reporting the results of forensic analysis are "testimonial," rendering the affiants "witnesses" subject to the defendant's Sixth Amendment right to confrontation. 557 U.S. at 307. There, the defendant was arrested, contraband was seized from him and his codefendants and submitted to a state laboratory for forensic chemical analysis, and certificates showing the results of the forensic analysis were submitted into evidence. Id. at 308. The defendant argued that the certificates were wrongly admitted and that the analysts were required to testify in person under the Confrontation Clause. Id. at 309.

The Court found that the documents at issue were testimonial, especially given that the Court's previous "description of [the 'core class of testimonial statements'] mentions affidavits twice" and the documents were clearly "'made for the purpose of establishing or proving some fact.'" Id. at 310 (emphasis added) (quoting Crawford, 541 U.S. at 51-52).

In responding to the dissent's suggestion that the affidavit at issue was analogous to the traditional admission at common law of "a clerk's certificate authenticating an official record," the majority opinion in Melendez-Diaz pointed out that "[a] clerk could by affidavit authenticate or provide a copy of an otherwise admissible record, but could not do what the analysts did here:

16

create a record for the sole purpose of providing evidence against a defendant." Id. at 322-23. Rather, the majority explained,

> Far more probative here are those cases in which the prosecution sought to admit into evidence a clerk's certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it. Like the testimony of the analysts in this case, the clerk's statement would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched. Although the clerk's certificate would qualify as an official record under respondent's definition -- it was prepared by a public officer in the regular course of his official duties -- and although the clerk was certainly not a "conventional witness" under the dissent's approach, the clerk was nonetheless subject to confrontation.
>
> [Id. at 323 (emphasis added).]

C.

Since Melendez-Diaz, the United States Supreme Court's Confrontation Clause jurisprudence has become less clear in certain respects. See generally Michaels, 219 N.J. at 20-31 (citing Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 567 U.S. 50 (2012)). That has led states, New Jersey included, to tread carefully, for example, with respect to forensic lab evidence and whether one or every analyst involved in a forensic analysis must testify. See id. at 28-49; see, e.g., Bass, 224 N.J. at 316-19 (taking care, with respect to testimony involving forensic autopsies, to enable meaningful cross-

17

examination of a witness who is not the original pathologist who performed the autopsy).  At present, our case law permits, as explained succinctly in Bass, a single, or even substitute, witness to testify and explain the results of an out-of-court data analysis, when the individual can "provide the independent 'verification of the data and results' that [were] contemplated in Michaels and Roach."  Bass, 224 N.J. at 319 (quoting Roach, 219 N.J. at 80).

That said, here, there is no ambiguity to the analysis required because no one testified regarding the affidavit.  As such, the issue is resolved by a straightforward application of the tenets of Melendez-Diaz, where, similarly, "no witness was offered to support and be cross-examined" regarding the challenged report.  Michaels, 219 N.J. at 32 (citing Melendez-Diaz, 557 U.S. at 308-09).  The prosecution sought to admit an affidavit that was created, as Melendez-Diaz put it, "for the sole purpose of providing evidence against a defendant."  557 U.S. at 322-23; see also Roach, 219 N.J. at 81 (holding that a DNA profile created by a forensic scientist from machine-generated data was testimonial because it was the scientist's "independent interpretation" of the raw data that converted the DNA profile "into unmistakably testimonial material subject to the Confrontation Clause").

To be clear, an affidavit attesting to the absence of a license created after a search of the firearm registry database is distinguishable from a previously

18

existing document that was not created for purposes of an individual defendant's prosecution. An example of the latter, as we held in Wilson, is a map created and maintained by a public entity for official purposes other than prosecution of a specific criminal defendant. See 227 N.J. at 551 (finding that admission of a map, created years before the commission of the alleged offenses and not in response to the criminal event, did not violate the Confrontation Clause). Indeed, another example of a non-testimonial "document," as readily conceded by Carrion, is the firearm license database itself. Such raw data, collected for a neutral administrative purpose, is not testimonial. Rather, it is the creation of a document attesting to an interpretation or search of that data -- for the sole purpose of prosecuting a defendant -- that is testimonial.

The upshot of all this is that a witness was required to explain the accuracy of the information entered into the database search for the existence of a firearm permit issued to Carrion, but no such witness was presented. With only the affidavit, and with no opportunity to question the officer knowledgeable about how the search of the database was performed, Carrion could not explore whether the officer used the correct date of birth, name, or other identifying information such as a social security number in order to

generate a correct search of the database, and what information that search produced.

Because the affidavit attesting to Bloom's search of the database is testimonial, and in light of the fact that Bloom did not testify and was not previously subjected to cross-examination, we conclude that Carrion's right to confrontation was violated.[6]

The State argues in the alternative that any confrontation error here was harmless because Carrion admitted the gun was his when interrogated at the police station. We review the admission of that statement in the ensuing section, but standing alone, without that later statement, this error was not harmless.

Although N.J.S.A. 2C:39-2(b) creates a statutory presumption in favor of the State if a defendant fails to present a firearm permit, we have made clear that "where statutory presumptions are involved, '[t]he jury should be instructed in terms of inferences which may or may not be drawn from a fact, the jury being at liberty to find the ultimate fact one way or the other.'" State v. Ingram, 98 N.J. 489, 499 (1985). We have reinforced that the State still

---

[6] We find the out-of-state case law advanced by the State and Attorney General unpersuasive. The case law cited either precedes Melendez-Diaz, or, in our view, does not adhere to the principles of Melendez-Diaz as we have enforced them.

bears the burden of proof on all elements of an offense. Id. at 500; see also

State v. Thomas, 132 N.J. 247, 255 (1993) (noting that "to pass constitutional

muster the presumption must remain permissive in criminal cases"). Here, the

absence of a permit is an essential element of a charged weapons-possession

offense. If the defendant's statement at the police station is inadmissible, then

the State would have to prove without the statement that the gun found in the

apartment belonged to defendant and that he did not possess the appropriate

permit.

Finally, on this issue, we acknowledge that the State has a valid

administrative concern. Requiring in-person testimony by the person who

conducted a search of firearm registry records that yielded no results under a

defendant's name for a gun permit -- in every firearm possession prosecution

-- could be burdensome and could lead to administrative inconvenience and

waste of resources. The applicable standard, however, is not whether it is

burdensome to call a police officer to testify about his or her findings. See

Melendez-Diaz, 557 U.S. at 325 (stating that "[t]he Confrontation Clause may

make the prosecution of criminals more burdensome," but the Clause

nevertheless "is binding, and we may not disregard it at our convenience").

The confrontation right under the Federal and State Constitutions entitled

defendant, who raised a timely objection, to claim error in his trial. See Wilson, 227 N.J. at 543-44.

Going forward, however, to help alleviate the administrative concerns of the State, we adopt the practice of notice and demand for the presentation of a State witness to testify to the search of the firearm permit database. Adoption of a notice requirement by which a defendant must inform the court and the State of a demand to have the State produce an appropriate witness will protect a defendant's right to confrontation. See State v. Williams, 219 N.J. 89, 99 (2014). By not demanding the witness's testimony, the defendant waives his confrontation right. See ibid. In many cases, the defendant may conclude that the production of the witness is unnecessary. At the same time, a notice requirement will promote administrative and judicial efficiency. We have adopted such useful practices before and have seen their benefits in other settings that include Crawford considerations. E.g., Wilson, 227 N.J. at 553-54 (creating a notice and demand procedure when a State witness is required to identify, on certified survey maps, the location of seized drugs used in certain drug prosecutions requiring proof of proximity to certain public places or buildings).[7]

---

[7] The practice was in fact adopted prior to issues arising as a result of Crawford's change in confrontation law. In State v. Miller, the Court used a similar method to reconcile and avoid potential burden-of-proof issues with

22

We refer the matter to the Criminal Practice Committee to study the issue generally and propose an appropriate court rule.

## III.

We turn next to the appellate issue concerning defendant's suppression motion, which affects whether the confrontation violation that occurred here was harmless, as well as whether defendant's otherwise incriminating statements should have been allowed to be heard by the jury.

## A.

"One of the most fundamental rights protected by both the Federal Constitution and state law is the right against self-incrimination." O'Neill, 193 N.J. at 167 (citing U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."); N.J.S.A. 2A:84A-19 ("[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him . . . ."); N.J.R.E. 503 (same)).

---

respect to a legislative enactment intended to reduce the administrative inconvenience of calling State Laboratory analysts as witnesses when a defendant was not contesting the scientific proof and did not have a desire to cross-examine on a particular lab report in a drug prosecution case. 170 N.J. 417, 436-38 (2002) (addressing a refinement in procedure for N.J.S.A. 2C:35-19(c)). Recognizing that the State nonetheless bore the burden of proof on all elements necessary for the prosecution of charged offenses, the Court superimposed procedural requirements concerning the statute's implementation. Id. at 436.

23

In <u>Miranda v. Arizona</u>, the Supreme Court put safeguards in place to protect the privilege against self-incrimination and respond to the "inherently compelling pressures which work to undermine the individual's will to resist and to compel [an individual subject to custodial interrogation] to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966) (requiring that an "accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored"). Enforcement of those safeguards is a job of the courts. "A confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights." <u>State v. Hubbard</u>, 222 N.J. 249, 265 (2015) (citing <u>Miranda</u>, 384 U.S. at 492).

Although defendants may waive "effectuation of" their <u>Miranda</u> rights, the waiver must be one that "is made voluntarily, knowingly, and intelligently." <u>Miranda</u>, 384 U.S. at 444. As expressed in this State, the standard is that the prosecution "must 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" <u>State v. Tillery</u>, 238 N.J. 293, 316 (2019) (quoting <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)).

The issue in this appeal concerns a homegrown area of jurisprudence regarding <u>Miranda</u> rights. We must decide whether a confession, given after

24

Miranda warnings, can be admissible when the suspect has previously been subjected to unwarned questioning in which he confessed. A natural concern in those circumstances is that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed." United States v. Bayer, 331 U.S. 532, 540-41 (1947). Due to the uncertainty under federal law on how to address that concern, see Oregon v. Elstad, 470 U.S. 298 (1985), and Missouri v. Seibert, 542 U.S. 600 (2004), this Court fashioned its own test for determining the admissibility of such statements, O'Neill, 193 N.J. at 180-81.

In O'Neill, we expressed our view that the key concern is whether the warnings provided in the second interrogation "function[] effectively," so as to limit the potential psychological burdens that the previous confession may have placed on the defendant and that could otherwise affect the voluntariness of the defendant's waiver. Ibid. We stated that, to assess how effectively the warnings in the second interrogation functioned,

> courts should consider all relevant factors, including: (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed

25

defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning. The factual circumstances in each case will determine the appropriate weight to be accorded to any factor or group of factors.

[Ibid.]

The O'Neill decision then provided more guidance for courts to use when considering the non-exclusive list of factors identified above. First, we pointed out that factor four, when found to be present, should receive "great weight" because "[p]roviding that information would strongly suggest that the defendant made any post-warning incriminating statements knowingly, voluntarily, and intelligently." Id. at 181.

Yet we took pains to stress that no single factor is determinative:

> We emphasize that we are not pronouncing a bright-line rule. For example, if the officers' pre-warning questioning is brief and the defendant's admissions are not incriminating or are barely incriminating and if there is a substantial break in time and circumstances between the pre- and post-warning interrogations, then those factors would militate against suppression of the defendant's statements. Another circumstance that may be considered is the defendant's prior experience with the criminal justice system. In a two-step interrogation case, courts must view the totality of the circumstances in light of the relevant factors and then determine whether the unwarned questioning and admissions rendered the Miranda warnings ineffective in providing a defendant the opportunity to exercise the privilege.

[Id. at 181-82.]

26

The fundaments to the O'Neill Court's guidance are three-fold: insistence on consideration of the totality of circumstances; guidance on the weight that should be given to some of the named factors when certain factfinding can be made; and judicial humility to recognize that the five factors identified to assist courts are non-exhaustive.

B.

Against that legal backdrop, defendant argues that the Appellate Division misapplied the O'Neill factors when considering the circumstances that connected his first, unwarned statement to his second, warned statement. Hewing to O'Neill's five-factor test for considering the totality of circumstances, defendant emphasizes that the psychological impact of what he had already let out of the bag was exacerbated by the continuing coercive impact of being told earlier by the arresting officers that if he did not accept responsibility for the gun and other contents of the black pouch, his children would be subjected to DYFS control.

The ACDL again supports defendant's position, but its argument goes further. It urges the Court to elevate the impact of one O'Neill factor: factor four, which asks whether the State told defendant that his unwarned statement could not be used against him. When that warning is not given, the ACDL urges us to give heavy, indeed determinative, weight to it and find that the

27

resultant waiver cannot be viewed as voluntary. Here, because Carrion was not informed that his first statement could not be used against him, the ACDL maintains that Carrion's waiver of rights was necessarily involuntary.

The State argues that defendant was not subjected to a traditional two-step interrogation, but even if viewed as such, it urges us to adhere to a totality approach that assesses the voluntariness of the waiver in Carrion's second statement using the O'Neill factors. The State argues that the circumstances were correctly assessed in their totality by the trial and appellate courts when denying defendant's suppression motion. The State and the Attorney General strongly urge against making O'Neill's fourth factor a controlling consideration. The Attorney General goes further and contends that factor four is not even relevant in the weighing process when the factual finding does not favor the State.

C.

1.

In this matter, we are called on to assess the weighing process engaged in by the trial court, as approved by the Appellate Division. In doing so, we dispense first with the competing arguments of the amici that, on the one hand, would render factor four conclusive if favorable to defendant (the ACDL's

position), or on the other hand, would render factor four irrelevant if it does not help the State (the Attorney General's position).

The arguments by both amici are extreme. The Attorney General would essentially do away with the fourth factor, again unless it helps the State. This Court, however, already gives "great weight" to that factor when a finding is made that law enforcement did inform a suspect -- before the suspect waived Miranda rights and provided a second statement -- that a prior unwarned statement could not be used against the suspect. The ACDL on the other hand asks for the creation of a bright-line rule that no waiver can pass muster if factor four is not met, despite this Court's emphasis in O'Neill that it was not creating a bright line.

The parties themselves work within the O'Neill factors. We shall do the same -- and not simply because ordinarily "an amicus must take the case on appeal as they find it." State v. Gandhi, 201 N.J. 161, 191 (2010). Importantly, the amici's arguments tip the otherwise thoughtfully balanced O'Neill factors in an unduly State-friendly or defendant-friendly way. Neither is called for, notwithstanding that this matter presents a close, fact-sensitive application of O'Neill. We turn to consider the factors, noting that the resolution of this matter requires particularly careful attention as to (1) which

29

side factor one should favor and (2) whether the totality of the factors favors admission or suppression of the post-warned statement.

2.

As we consider how the legal standards we have set forth apply to the facts of this matter, we are mindful of the applicable standard of appellate review. "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (quotation omitted). That said, the interpretation of law "and the consequences that flow from established facts" are not entitled to deference and are reviewed de novo. Hubbard, 222 N.J. at 263.

The first O'Neill factor considers "the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights." 193 N.J. at 181. In O'Neill, the defendant was interrogated without warning for ninety-five minutes, he was in a jail cell and in the police commander's office, and he "admitted to playing a role in a scheme to lure a cab driver into a robbery trap." Id. at 182. Although we did not explicitly say so, factor one as analyzed under the facts in O'Neill presented an almost quintessential example that favored suppression. The questioning was extensive, intimidating, and the defendant essentially admitted to the crime.

30

Application of the first factor in this appeal, however, is not as clear cut. First, the initial questioning did not occur in a prison or police station, as it did in O'Neill; that said, the trial court did find that the first questioning was part of a custodial interrogation for purposes of suppressing Carrion's first statement where Miranda warnings were not provided. And, unlike the defendant in O'Neill, Carrion did not implicate himself in Rivera's shooting in his first statement. Using O'Neill as a point of comparison, the questioning here could be viewed as shorter in duration and less extensive, and Carrion did not admit to the most serious crime with which he was charged.

However, during the questioning Carrion admitted to possession of an illegal gun and drugs, which led to serious charges for which Carrion was later convicted. Additionally, it is significant that five police officers entered Carrion's home for the purpose of arresting him pursuant to a warrant and promptly handcuffed him as he was awakening, giving rise to a pressured situation in which he ultimately admitted that the black bag was his.

Adding to the mix is whether the officers made known to Carrion that he faced the consequence of a call being made to DYFS which would lead to Carrion's children being taken away from his wife unless he took responsibility for the black pouch or purse and its contents. At the suppression hearing, Carrion's wife and stepson both testified that statements to that effect

31

were audibly made in their presence. The testifying officer who executed Carrion's arrest denied making any threat or similar coercive statement. On this point, the trial court's finding, which deserves our deference, is critical to our analysis. In the context of determining whether the arresting officers subjected Carrion to an interrogation, the trial court found as follows:

> Detective Maldonado again testified that he did not recall anyone hearing anything about DYFS. That is his recollection. However, Ms. Gonzalez and Mr. Trevino testified differently about the specifics. They did testify consistently that they overheard -- that they heard officers indicate that they would need to call DYFS . . . if Carrion did not own up to the contraband. Now, and I will note that would have been a truthful statement as they would have had a duty to call DCPP. However, that inquiry or any such inquiry would have -- would have been an -- an inquiry that would have triggered Miranda protection. . . .
>
> So, then it follows if Mr. Carrion was given any Miranda warning before any such inquiry. And as to whether there was any such inquiry, I am going to give the defendant the benefit of the doubt having had two witnesses who testified that they -- they did hear some inquiry.

Although the trial court's factual finding was made under a different legal analysis -- whether there was an "interrogation" for Miranda purposes -- the court ultimately premised its finding that there was an "inquiry" on testimony that the arresting officers told Carrion that they would have to call DYFS unless he admitted to possessing the gun and drugs. We recognize that

32

the point was contested by the parties, but there is a factual finding by the trial court of a statement evidencing a threat, although it was not called such, about contacting DYFS. The trial court gave Carrion the benefit of the doubt as to the fact of the utterance and accepted the reference to DYFS as having been made. We defer to that finding.

And although the trial court's finding was not used as part of an O'Neill analysis, we view that factual finding as probative in our consideration of the first O'Neill factor. Carrion was not merely subjected to the "inherently compelling pressures which work to undermine the individual's will to resist" and which accompany any custodial interrogation, Miranda, 384 U.S. at 467; rather, those conditions were augmented by apparent statements that the agency of government known to take children from their families and into State care would be contacted unless Carrion took responsibility for the gun and contraband. Although not precisely on point, the Supreme Court has recognized the strongly coercive nature of threats to remove a suspect's children unless he or she confesses. Cf. Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding that a confession was involuntary under the Due Process Clause where the defendant's "oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'"). We accordingly hold

33

that those comments, found by the trial court to have been made, added to the coercive effect of the officers' efforts to secure an admission from Carrion.

Placing that factual finding under the lens of the first O'Neill factor, it is evident that Carrion faced two sources of psychological pressure not to assert his Miranda rights in his second interview: the fact that he had already let the cat out of the bag in his first statement, and the potential belief that the threat to call DYFS, unless he admitted ownership of the black bag, was still in effect. Given that there is no evidence that the possibility of a call to DYFS was ever revoked or further explained to Carrion, it stands to reason that, during his second interview, he still feared that the police would call DYFS and remove his children from their mother unless he continued to accept responsibility for the gun and contraband in the black pouch found in his home. Viewed as such, the first factor favors suppression of Carrion's second statement.

With that significantly different view of the application of facts to law (from that of the Appellate Division) with respect to factor one, we consider next the totality of the circumstances.

3.

The key inquiry when viewing the totality of the O'Neill factors is whether the second set of Miranda "warnings functioned effectively in

34

providing the defendant the ability to exercise his state law privilege against self-incrimination." O'Neill, 193 N.J. at 180-81. Under the circumstances of Carrion's two confessions, we cannot conclude beyond a reasonable doubt that he knowingly and voluntarily waived his Miranda rights when providing his second statement. See Tillery, 238 N.J. at 316.

We address first factors two, three, and five. The second factor considers whether there was a clear and substantial break in time and place "between the pre- and post-warning questioning." O'Neill, 193 N.J. at 181. The second interview here took place in a different location six hours after the arrest and initial confession. While we do not view a separation of six hours in time as a bright line when considering this factor, we accept the Appellate Division's assessment that this factor weighs in favor of admission. Next, under the third factor, the detective who conducted the second interrogation -- Detective James -- was not the officer who conducted the first interrogation. Based on the record presented, Detective James apparently had no involvement in Carrion's case other than the one interview he conducted, and there is no dispute that he was uninvolved in Carrion's arrest. Factor three thus also favors admission. And, for similar reasons as those present for factors two and

35

three, under the fifth factor, the post-warning questioning was not "a continuation of the pre-warning questioning."[8]  Ibid.

On the other hand, like factor one, factor four favors suppression. Specifically, under factor four, Detective James plainly did not inform Carrion "that his pre-warning statements could not be used against him."  Ibid.

This appeal thus comes down to a weighing of factors two, three, and five against factors one and four.  An additional consideration weighing against Carrion is his "prior experience with the criminal justice system."  Ibid. Considered qualitatively, we hold that factors one and four, in this particular case, outweigh the other factors.

As discussed, Carrion was not only burdened with a cat-out-of-the-bag mentality when he went in for his second interview, but he also could very well have remained under the looming fear that the police would call DYFS if he did not continue to admit to ownership of the drugs and gun.  Thus, he may have been constrained from invoking his Miranda rights out of continued fear that if he did so, his children would be taken away from his wife and placed into DYFS care.

---

[8]  Still, simply because the second questioning was not, formally speaking, a continuation of the first does not mean that the impact of the DYFS threat on defendant did not continue into the interview with Detective James.

The standard of proof that the State must meet requires a showing that Carrion's waiver was knowing, intelligent, and voluntary beyond reasonable doubt. We are unconvinced that the break in time, use of a different detective, and separation between the first and second interrogations neutralized the dual psychological burden faced by Carrion. Even assuming the efficacy of those factors in counterbalancing a typical cat-out-of-the-bag mentality, they are inadequate to offset -- to a degree that would allow a finding of voluntariness beyond a reasonable doubt -- defendant's likely fear that he needed to maintain his admission to avoid his children's removal. It bears repeating that in the second interview, Carrion admitted only to possession of the gun and not to the shooting of Rivera. That choice by Carrion -- to admit only to the crime he previously confessed to -- supports that he was indeed afflicted by some combination of the cat-out-of-the-bag mentality and the DYFS threat, which, again, was directed at him only in the context of establishing ownership of the black pouch or purse. Accordingly, we hold that that fear of intervention by DYFS, in combination with his lack of knowledge that his first confession could not be used against him, pushes the totality of circumstances in Carrion's favor.

D.

In closing, we note that it is rare that an unconstitutionally secured confession is deemed harmless beyond a reasonable doubt, for we have recognized "that inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment." State v. McCloskey, 90 N.J. 18, 31 (1982) (holding that courts should apply the "harmless error doctrine sparingly," in cases "[w]here the State has violated the defendant's privilege against self-incrimination"); see also Tillery, 238 N.J. at 334 n.3 (Albin, J., dissenting) (collecting cases rejecting harmless error claims). Such is the case in this appeal. Carrion admitted to Detective James that he was at the shooting, he owns a gun without a permit, and he was in possession of drugs. It was not harmless to admit those statements.

E.

Defendant is entitled to a new trial where his second statement shall not be admissible. Moreover, in light of our holding suppressing his second statement, we further hold that the violation of defendant's confrontation right, as set forth in Section II of this opinion, is not harmless.

IV.

For the reasons expressed, the judgment of the Appellate Division is reversed, and the matter is remanded for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.